.IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THREE CELLULAR TELEPHONES FURTHER DESCRIBED IN ATTACHMENTS A-1, A-2, AND A-3 | Case No. 3:24-mj-00352-WCM |

## AFFIDAVIT IN SUPPORT OF APPLICATIONS UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, **Jaleel Smith**, being first duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this Affidavit in support of Applications under Rule 41 of the Federal Rules of Criminal Procedure for Search Warrants authorizing the examination of property – electronic devices – which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. Your Affiant, Jaleel Smith, is a sworn Law Enforcement Officer serving the Maiden Police Department, with over six (6) years of law enforcement experience. Your Affiant holds the rank of Investigator and is currently assigned to the Criminal Investigation Division. Your Affiant was previously employed with the Hickory Police Department for over three (3) years where Your Affiant served as a Patrol Officer, as well as in Criminal Investigations Division/Street Crimes. Your Affiant attended and completed the North Carolina Basic Law Enforcement Training at Western Piedmont Community College. Your Affiant also worked as a certified Law Enforcement Officer in the State of South Carolina where Your Affiant completed the South Carolina Criminal Justice Academy. Your Affiant has successfully completed Homeland Security basic Task Force Officer training. Your Affiant is a Sworn Task Force Officer with the United States Department of Homeland Security assigned to the Homeland Security Investigations (HSI)

Charlotte Transnational Organized Crime-Violent Crime Task Force (TOC-VGTF). Your Affiant has an Associate of Science in Criminal Justice Degree and a bachelor's degree in Homeland Security from Columbia Southern University. Your Affiant has been involved in numerous felonies and/or misdemeanor cases that were successfully prosecuted in the courts, including, but not limited to, homicides, robberies, rapes, burglaries, financial crimes, frauds, larcenies, assaults, sexual offenses, controlled substance violations, death investigation, and breaking and entering's. Your Affiant is familiar with the practices, methods, identification of individuals using and selling controlled substances, and identifying illegal controlled substances.

3. I am familiar with the practices, methods, identification of individuals who cooperate in organized criminal activity, such as gangs and other groups. I am familiar in the areas of identifications of drugs, use of informants, preparation of search warrants and drug interdiction. Your Affiant has conducted and assisted with numerous Local, State and Federal controlled substances and firearm. investigations. I have also attended numerous training sessions involving narcotics identification and Methamphetamine Investigation training. My training and experience include the areas of identifications of drugs, use of informants, preparation of search warrants and drug interdiction.

4. I am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing controlled substances, their use of telephones, and their use of numerical codes and code words to conduct their transactions. I am familiar with and have participated in all the normal methods of investigation, including, but not limited to, visual surveillance, the general questioning of witnesses, the use of informants and cooperating defendants, and undercover operations.

5. Based upon my training and experience, I am familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of narcotics, the collection of narcotics trafficking proceeds, and methods of money laundering used to conceal the nature of such proceeds. I have conducted investigations regarding the unlawful possession and

distribution of controlled substances in violation of 21 U.S.C. §§ 841(a) and 846, as well as other controlled substance offenses. I have been the affiant on search warrants. As a case agent, I have experience in the fundamentals of mobile communications and electronic and cellular data analysis.

6. The facts contained in this Affidavit are based in part on my personal observations, background, experience, and training, and information provided by other law enforcement officers, confidential sources ("CS") of information and other witnesses. This Affidavit is intended to show merely that there is sufficient probable cause for the requested Warrant and does not set forth all my knowledge about this matter.

7. For the purpose of supporting these Applications for Search Warrants, I have set forth herein facts that I believe are sufficient to establish probable cause to believe that evidence of multiples violations of 21 U.S.C. § 841 is located in the following devices seized from BAKER'S residence, located at 703 East Main St, during a MPD/CCSO operation on September 12, 2024: (i) a black Samsung Galaxy A13, further described in Attachment A-1 ("**TARGET PHONE A**"). **TARGET PHONE A** is currently located at the MPD in the evidence storage room in Maiden, North Carolina. (ii) A blue Motorola Cellular Telephone, further described in Attachment A-2 ("**TARGET PHONE B**"). **TARGET PHONE B** is currently located at the MPD in the evidence storage room in Maiden, North Carolina. (iii) A purple Motorola Cellular Telephone, further described in Attachment A-3 ("**TARGET PHONE C**"). **TARGET PHONE C** is currently located at the MPD in the evidence storage room in Maiden, North Carolina. The applied for Warrants would authorize the forensic examination of the **TARGET CELL PHONES** for the purpose of identifying electronically stored data particularly described in Attachment B.

8. The information in this Affidavit is based upon my background and experience, my personal observations and knowledge of this investigation, and information provided to me by other law enforcement officers and other witnesses. Because of the limited purpose of this

Affidavit, I have not included each and every fact known to me regarding this investigation, but only those facts I believe necessary to establish probable cause for these Warrants.

9. The Court has jurisdiction to issue the proposed Warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated. *See* 18 U.S.C. § 2711(3)(A)(i).

## FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE:

10. The MAIDEN POLICE DEPARTMENT ("MPD"), CATAWBA COUNTY SHERIFFS OFFICE ("CCSO"), AND HOMELAND SECURITY INVESTIGATIONS – CHARLOTTE ("HSI") has been investigating the drug distribution activities in and around the Town of Maiden and Catawba County areas of North Carolina. Investigators identified an individual distributing large amounts of illegal controlled substances throughout the counties, specifically crack-cocaine.

11. MPD, CCSO, HSI, and the TRANSNATIONAL ORGANIZED CRIME-VIOLENT CRIME TASK FORCE (TOC-VGTF), conducted a criminal investigation into Paul Douglas BAKER (DOB: 05/13/1952) ("BAKER") for trafficking narcotics, in violation of, Title 21, United States Code § 841(a) (distribution of narcotics). During the investigation, law enforcement identified a RED NISSAN ALTIMA (NC TAG: VCX 7167) ("RED ALTIMA") and a BLACK NISSAN PATHFINDER (NC TAG: KMX 7309) ("BLACK PATHFINDER") as vehicles utilized by BAKER for narcotics trafficking activity. Officers have conducted multiple controlled purchases, surveillance, and other investigative means and identified BAKER as an individual distributing large amounts of crack-cocaine throughout Catawba County and Maiden, North Carolina. Throughout this investigation, it has become apparent that BAKER is an instrumental part in supplying individuals in the Maiden, Newton, and Conover, North Carolina areas with quantities of crack-cocaine.

12. MPD became aware that once BAKER completed an active federal sentence[1], he was released, and returned to reside at 703 EAST MAIN ST, MAIDEN, NORTH CAROLINA ("MAIN ST. RESIDENCE"). Since he has returned, vehicle traffic, foot traffic, and persons around MAIN ST. RESIDENCE have persistently increased. Based on your Affiant's training and experience this trend is consistent with a residence involved in the sale of illegal narcotics. MPD Investigators reinitiated an investigation into possible illegal narcotic activity at the residence of MAIN ST. RESIDENCE in July 2024.

13. In July 2024, MPD Investigators initiated trash collection/pull investigations from MAIN ST. RESIDENCE, to locate any possible evidence related to the investigation of the sell, use, or distribution of illegal narcotics and maintaining a dwelling for the use or sell of said illegal controlled substances.

14. Through physical surveillance of BAKER, investigators observed numerous interactions and activity where BAKER was seen coming to and from MAIN ST. RESIDENCE. BAKER was also seen arriving at various residences throughout Catawba County, North Carolina. BAKER would stay at these residences for a short period of time before leaving the residences. On occasion, BAKER was seen meeting with individuals in the business parking lot of the" Hop In" Gas Station (112 Island Ford, Maiden, North Carolina) and Food Lion (201 Island Ford Rd, Maiden, North Carolina) for short periods of time. Law enforcement observed BAKER operating BLACK PATHFINDER in Newton, North Carolina, during a suspected narcotics deal. During this occasion, a white female walked to the passenger side front window of BLACK PATHFINDER. The interaction with the woman was quick and through the window of BLACK PATHFINDER. After almost every meeting and/or short interaction with persons in either vehicles or residences,

---

[1] BAKER was released in late 2020 after serving 240 months in federal prison for Conspiracy to Poss/Dist. Cocaine & Cocaine Base.

BAKER would return to MAIN ST. RESIDENCE. Based on your Affiant's training and experience, the behavior in each of the aforementioned incidents is consistent with illegal narcotics trafficking.

15. On July 25, 2024, Your Affiant observed BAKER operating RED ALTIMA at MAIN ST. RESIDENCE. Surveillance was conducted and investigators observed RED ALTIMA leaving MAIN ST. RESIDENCE and traveled to 702 County Home Road in Conover, North Carolina. BAKER's vehicle was at 702 County Home Road in Conover, North Carolina for only a few minutes before the vehicle was seen leaving the residence and area. Your Affiant investigated the residence through a police database and found that individual(s) associated with 702 County Home Road Conover, North Carolina, have past illegal controlled substance and drug paraphernalia charges. After observing BAKER's vehicle leave 702 County Home Rd Conover, NC, Investigators observed RED ALTIMA travel to the address of 167 Eighth Ave SW Conover, NC, and park in front of the residence near the roadway. RED ALTIMA was at 167 Eighth Ave SW Conover, NC for several minutes and then left the area traveling to downtown Newton, NC. Approximately an hour later, Investigators located RED ALTIMA in downtown Newton, NC. At this time, it was raining. Investigators observed RED ALTIMA pull over on to the side of a roadway and meet with a white female. BAKER never exited the vehicle when the female approached the front passenger window and began interacting with those inside. This interaction appeared to your Affiant to be consistent with an illegal narcotics transaction. After a brief interaction with this unknown female, RED ALTIMA then left the area and approximately thirty minutes later arrived back to MAIN ST. RESIDENCE. Approximately two and a half hours later, RED ALTIMA left MAIN ST. RESIDENCE and traveled to a duplex style apartment located on 611 E Boyd St Maiden, NC 28650. RED ALTIMA was only at this location on 611 E Boyd Street, Maiden NC 28650 for approximately three minutes until investigators observed BAKER exit the

apartment and leave in RED ALTIMA.

16. On July 29, 2024, Maiden Police Officers and Investigators conducted a Trash Pull Investigation at MAIN ST. RESIDENCE using an acquired Town of Maiden work Truck. This Town of Maiden work truck was cleaned out and ensured no trash was located inside the bed. Investigators seized the trash from the sidewalk area on the road curb, next to driveway of MAIN ST. RESIDENCE. The trash cans designated for MAIN ST. RESIDENCE was positioned at the end of driveway in a manner to be abandoned for picked up.

17. Investigators left MAIN ST. RESIDENCE, went back to the MPD, and began going through the trash that was seized. Two clear trash bags containing loose trash and some smaller grocery bags were collected and looked through at MPD, by MPD Investigators, your Affiant included. The following items were located, seized, photographed, and placed into evidence at MPD as evidence:

- (Evidence Item # 004) - pieces of burned copper mesh "Chore Boy" filling both with burned residue (used as a filtering device inside of a "crack" cocaine smoking pipe)
- (Evidence Item # 005) – Numerous small clear individual torn baggies and pieces of baggie with white cocaine residue (some white rock like residue was removed from these baggies and field tested specifically for cocaine with a positive response for cocaine)
- (Evidence Item # 006) - Larger clear baggies (one torn and tied in a knot, one with "apple" print on it, and one baggie appeared to be used and open at the top).

Based upon your Affiant's training and experience, your Affiant knows the above listed items located and placed into evidence are indicative of and consistent with illegal narcotics use and preparation for the distribution of controlled substances. Mail items were also located inside the trash that was addressed to Paul Baker at 703 East Main St, Maiden, North Carolina, 28650. These mail items were photographed and later discarded.

18. Later in the day, on July 29, 2024, Maiden Police investigators observed a GRAY NISSAN arrive at MAIN ST. RESIDENCE. Investigators watched what appeared to be a female occupant of the GRAY NISSAN exit the vehicle and meet with BAKER on the front porch of MAIN ST. RESIDENCE. The encounter between BAKER and the female was short in duration and lasted approximately five minutes before GRAY NISSAN left MAIN ST. RESIDENCE. Approximately forty minutes later, Maiden Police investigators observed a white Toyota Avalon passenger vehicle arrive at MAIN ST. RESIDENCE and BAKER (wearing red and black clothing) met the Toyota in the driveway of MAIN ST. RESIDENCE. At this time, BAKER met with the occupants of the vehicle at the passenger side window. The driver of the Toyota exited the vehicle and went to the rear of the vehicle, opening the trunk. BAKER then stepped to the rear of the vehicle with the driver briefly and then returned to the passenger side window. The driver of the Toyota then closed the trunk and got back into his vehicle and BAKER walked back toward his residence. The duration of time of the Toyota arriving at MAIN ST. RESIDENCE until it left the area was approximately two or three minutes. The Toyota left the area traveling west however, shortly after, Investigator Jaleel Smith observed the same vehicle traveling east on East Main St in Maiden, past MAIN ST. RESIDENCE toward Providence Mill Road. Investigators shared information and a description of the WHITE, TOYOTA AVALON CAR (NC TAG: JMJ 8031) ("TOYOTA") and that fact that the vehicle was very dirty (in appearance). Investigator Lee was close to Providence Mill Rd, in the area TOYOTA was last observed. Investigator David Lee observed TOYOTA traveling from this area of Providence Mill Rd with two or three occupants inside. Investigators were able observe the registration numbered plate on TOYOTA and determine it was registered to a James Anthony B/M DOB: 09/25/1936 out of Catawba, NC. Through an online Law Enforcement database, Investigators located the same James Anthony B/M DOB: 09/25/1936 out of Catawba, NC who was charged with felony possession of controlled substances

several years ago.

19. During the August and September 2024, your Affiant and the Investigative team conducted multiple purchases of illegal narcotics, specifically Crack Cocaine, firearms and ammunition from BAKER, utilizing a confidential source and an Undercover Law Enforcement Officer.

20. On August 2, 2024, Confidential Source 3616[2] contacted BAKER by phone at 704-740-5893 (Target Phone A) to purchase quantities of crack cocaine from BAKER. Investigators know this phone number to belong to **TARGET PHONE A**. Confidential Source 3616 responded to BAKER's residence (MAIN ST. RESIDENCE) shortly after contacting BAKER by phone and purchased quantities of crack cocaine. While at MAIN ST. RESIDENCE, BAKER asked Confidential Source 3616 to assist him in sending photo images of firearms via text messaging from 704-740-5893 to various individuals. Confidential Source 3616 sent the images of the firearms from BAKER's cellular telephone 704-740-5893 to Confidential Source 3616 cellular telephone with BAKER's permission.

21. On August 2, 2024, Catawba County Sheriff Office Investigator Josh Rector, acted as an Undercover Law Enforcement Officer ("UC1") and contacted BAKER by phone at 704-740-5893 (Target Phone A) to coordinate and purchase multiple firearms from BAKER. UC1 responded to MAIN ST. RESIDENCE on this date to purchase firearms from BAKER. The deal was completed successfully.

22. On August 5, 2024, Confidential Source 3616 contacted BAKER by phone at 704-740-5893 to purchase quantities of crack cocaine from BAKER. Confidential Source 3616 responded to MAIN ST. RESIDENCE shortly after contacting BAKER by phone and purchased quantities of crack

---

[2] CS 3616 has no convictions for perjury or crimes of dishonesty. CS 3616 provided information that was independently corroborated by law enforcement officers.

cocaine. According to Confidential Source 3616, BAKER often stores the crack cocaine on his person, under his testicles. In my training and experience, your Affiant knows that drug traffickers frequently store narcotics in such places as a way to conceal their activity from law enforcement.

23. On August 8, 2024, UC1 contacted BAKER by phone at 704-740-5893 (Target Phone A) to coordinate and purchase quantities of crack cocaine from BAKER. UC1 and BAKER met at a predetermined location of the Dollar General located at 2122 West Maiden Road, Maiden, North Carolina where BAKER sold UC1 distribution quantities of crack cocaine. BAKER arrived at the Dollar General operating his RED NISSAN ALTIMA.

24. On August 26, 2024, UC1 contacted BAKER by phone at 704-740-5893 (Target Phone A) to coordinate and purchase quantities of crack cocaine from BAKER. UC1 and BAKER met at the same Dollar General from the August 8 sale. There, BAKER sold UC1 distribution quantities of crack cocaine. BAKER arrived at Dollar General operating his RED NISSAN ALTIMA. The use of an installed electronic tracking device on the RED ALTIMA also provided location data which shows the electronic tracking device on RED ALTIMA left MAIN ST. RESIDENCE and return sometime after the transition was completed.

25. On September 4, 2024, UC1 contacted BAKER by phone at 704-740-5893 (Target Phone A) to coordinate and purchase quantities of crack cocaine from BAKER. UC1 and BAKER met at the Sunshine Coin Laundry, located at 223 Island Ford Rd, Maiden, North Carolina, where BAKER sold UC1 crack cocaine. Upon arrival, UC1 observed BAKER in the RED ALTIMA's driver seat. BAKER greeted UC1 at the rear of his vehicle. BAKER and UC1 sat inside of the undercover vehicle, UC1 in the driver seat and BAKER in the front right passenger seat. As the two entered the vehicle, BAKER handed UC1 a clear plastic bag that contained a white rock substance from his right hand. UC1 handed BAKER $250.00 of pre-recorded special funds which Baker placed in his front right pocket.

- UC1 told BAKER "I am going to meet ol [sic] girl and we going to the beach next week, trying to get something a little heavier because we are going to be there all week, and she likes that shit pretty good, you know how it is, I am definitely leaving next week, and a quarter ounce isn't going to be enough for all week."

- BAKER said, "you want a whole one?" UC1 replied, "yeah, if you can do it, that would do me all week, what are you looking at price wise?"

- BAKER said probably about, "eight fifty or somewhere in there, that's twenty-eight grams that's eight fifty."

- UC1 said, "you be good for that next week?" BAKER said "yeah, just let me know a day ahead and I will try to get it."

- UC1 said, "I will just plan to get a whole one from you next Thursday."

26. Prior to UC1 arriving at the predetermined meeting location, BAKER told UC1 that he was at a Laundry Mat in Maiden, North Carolina, but had to go to his residence to retrieve the illegal narcotics and would then return to the Laundry Mat. Physical surveillance of MAIN ST. RESIDENCE showed the RED ALTIMA backing from the driveway of MAIN ST. RESIDENCE on September 4, 2024, at approximately 10:34:05 hours. Surveilling officers next watched the RED ALTIMA traveling East on East Main St in the direction of Sunshine Coin Laundry. The electronic tracking device on RED ALTIMA provided location data which showed the RED ALTIMA arrive at Sunshine Coin Laundry at approximately 10:37 hours. At approximately 10:53:32 hours, physical surveillance confirmed the RED ALTIMA arrived at the MAIN ST. RESIDENCE.

27. Based on conversation between BAKER and UC1, the narcotic transaction date for an ounce of crack cocaine was set for September 12, 2024. Officers planned to arrest BAKER after the deal.

28. On September 12, 2024, Investigators conducted a controlled purchase utilizing UC1. UC1

contacted BAKER by phone at 704-740-5893 (Target Phone A) to coordinate and purchase crack cocaine from BAKER. Officers were to receive an ounce (28 grams) of crack cocaine from BAKER for $900 U.S. dollars in law enforcement funds. The deal took place at the same Sunshine Coin Laundry Mat in Maiden, North Carolina. BAKER arrived at the meet location driving the BLACK PATHFINDER. After the deal was successfully completed, officers initiated a takedown arrest of BAKER. During a search incident to BAKER's arrest, law enforcement found additional suspected crack cocaine on BAKER'S person, specifically in his sock. **TARGET PHONE A** was located on BAKER's person and seized from BAKER'S person, at the time of his takedown and arrest.

29. On September 12, 2024, a search warrant was applied for and granted by United States Magistrate Judge David C. Keesler for MAIN ST. RESIDENCE. Law enforcement located two additional cellular telephones inside MAIN ST. RESIDENCE (previously referred to as **TARGET PHONE B** and **TARGET PHONE C**). Both cellular telephones were located on a nightstand style dresser in a rear left bedroom beside a bed. Both cellular telephones were powered on. Both cellular telephone, **TARGET PHONE B** and **TARGET PHONE C** were seized from the residence.

30. Throughout this investigation, and from information obtained from the Confidential Source, law enforcement determined that BAKER resided at MAIN ST. RESIDENCE alone. There were times persons would visit the residence and stay overnight but these persons do not appear to reside at the residence with BAKER. While searching the residence on September 12, 2024, **TARGET PHONE B** and **TARGET PHONE C** were located inside the rear left bedroom on a nightstand. Male clothing, shoes, medication bottles, and mail with BAKER's name on it were located inside the bedroom. Investigators photographed a white powdery residue with a cut straw, razor blades, and medication bottles with pills inside located on a nightstand inside the rear left bedroom. The nightstand was near the foot of the bed. Your Affiant knows through training and experience that

individuals who use illegal narcotics or medication pills will sometimes use razor blades to cut up illegal narcotics or pills and then use a straw to snort the illegal narcotics or pills into their nose. Through training and experience, your Affiant knows that medication pills, fake fentanyl pills, and/or powdered cocaine, are substances sometimes introduced into the body by a user through the nasal cavity.

31. The following items were found in the back left bedroom closet, a black and orange Puma case containing numerous clear Ziploc baggies with marijuana, medication bottles with marijuana bearing the name, "Paul D Baker", (2) two clear baggies of crack cocaine, 95 cents, rolling paper, two lighters, tic tacs, pen, memo book, scissors and (5) Five $20.00 bills of US Currency wrapped with yellow rubber band. The black and orange case was located inside a brown box. The crack cocaine field tested positive for cocaine-based narcotics using TRUNARC. Your Affiant reasonably believes that the left rear bedroom was occupied, used, and owned by BAKER alone.

32. During the search execution, the Investigative Team located and later arrested Rebecca Nicole Huitron. Huitron was found hiding in a bedroom inside the residence. Huitron had personal items at the residence that were located inside a back porch room (a different room from the rear left bedroom). Her personal items included a cellular telephone, phone charger, and black purse which Rebecca Nicole Huitron stated belonged to her. Huitron also told members of the Investigative Team that methamphetamine would be located inside her Black purse which was later found. Huitron did not claim any other items inside the residence.

33. Your Affiant knows through my training and experience that individuals who intend to sell illegal narcotics will often carry and/or have multiple cellphones to coordinate and conduct the sale of illegal narcotics. Your Affiant knows that individuals who sell illegal narcotics will often switch phones or phone numbers while the individual is involved in the illicit drug trade to further conceal their actions and identity from being detected by law enforcement officers. Your Affiant

reasonably believes that the issuance of this search warrant application will confirm that BAKER kept **TARGET CELL PHONES** for to coordinate and conduct the sale of illegal narcotics.

## TECHNICAL TERMS

1. Based on Your Affiant's training and experience, Your Affiant use the following technical terms to convey the following meanings:

    a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also

include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive

e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

2. Based on my training, experience, and research, Your Affiant knows that the DEVICES have capabilities that allow it to serve as some of the following but not limited to: a wireless telephone, digital camera, portable media player, GPS navigation device, PDA, and data storage device. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the DEVICES.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

1. Based on Your Affiant's knowledge, training, and experience, Your Affiant knows that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

2. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the DEVICES were used, the purpose

of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the DEVICES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

3. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant Your Affiant is applying for would permit the examination of the DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the DEVICE to human inspection in order to determine whether it is evidence described by the warrant.

4. *Manner of execution.* Because this warrant seeks only permission to examine the DEVICES already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, Your Affiant submits there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

5. Your Affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the **TARGET CELL PHONES** described in Attachments A-1, A-2, and A-3 to seek the items described in Attachment B.

Respectfully Submitted,

/s/ Jaleel Smith

Jaleel Smith
Task Force Officer
Homeland Security Investigations (HSI)
Charlotte Transnational Organized Crime-
Violent Crime Task Force TOC-VGTF

**Affidavit Reviewed by Assistant United States Attorney Brandon Boykin**

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 8th8th day of November, 2024, at 12:19 PM

W. Carleton Metcalf
United States Magistrate Judge

## ATTACHMENT A-1

The property to be searched is:

A Black Samsung Galaxy A13, further described in Attachment B ("**TARGET PHONE A**"). **TARGET PHONE A** is currently held in evidence at the MPD located at 400 East Main St, Maiden NC 28650.

## ATTACHMENT A-2

The property to be searched is:

A Blue Motorola Cellular Telephone further described in Attachment B ("**TARGET PHONE B**"). **TARGET PHONE B** is currently held in evidence at the MPD located at 400 East Main St, Maiden NC 28650.

## ATTACHMENT A-3

The property to be searched is:

A Purple Motorola Cellular Telephone further described in Attachment B ("**TARGET PHONE C**"). **TARGET PHONE C** is currently held in evidence at the MPD located at 400 East Main St, Maiden NC 28650.

# ATTACHMENT B

1. All records on **TARGET CELL PHONES** described in Attachments A-1, A-2, and A-3 that relate to violations of Title 21 United States Code, Section 841, involving Paul Douglas BAKER since July 2024, including but not limited to:

    a. lists of customers and related identifying information;

    b. types of, prices of drugs trafficked as well as dates, locations, and amounts of specific transactions;

    c. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

    d. any information recording Baker's schedule or travel from July 2024 to the present;

    e. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who used or owned **TARGET CELL PHONES** at the time the things described in the Search Warrants were created, edited, or deleted, such as logs, short message system (SMS) messages, phonebooks, photographs, saved usernames and passwords, documents, and browsing history.